*PRELIMINARY PRINT*

VOLUME 604 U. S. PART 1
PAGES 86–114

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JANUARY 21, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## ANDREW *v.* WHITE, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 23–6573.   Decided January 21, 2025

An Oklahoma jury convicted petitioner Brenda Andrew of murdering her husband and sentenced her to death.   Andrew appealed, arguing that the introduction of irrelevant evidence at trial (about her sex life, extramarital affairs, and provocative attire) was so prejudicial as to violate the Federal Due Process Clause.   Despite acknowledging that some evidence introduced against Andrew was irrelevant, the Oklahoma Court of Criminal Appeals (OCCA) denied relief on the ground that the trial court's errors had been harmless.   Andrew reiterated her due process claim in a federal habeas petition, but the District Court denied relief.   A divided Tenth Circuit affirmed on the ground that Andrew had failed to identify "clearly established federal law governing her claim," as required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).   28 U. S. C. §2254(d)(1).   The majority acknowledged that Andrew's due process claim relied on *Payne* v. *Tennessee*, 501 U. S. 808, in which this Court said that the Due Process Clause "provides a mechanism for relief" when the introduction of unduly prejudicial evidence "renders [a] trial fundamentally unfair," *id.*, at 825, but concluded that this statement was not a holding and thus did not reflect "clearly established federal law."

*Held*: At the time of the OCCA's decision, clearly established federal law provided that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair.   As relevant here, AEDPA provides that a federal court may grant habeas relief as to a claim adjudicated on the merits in state court if the state court unreasonably applied "clearly established Federal law, as determined by" this Court.   §§2254(d)(1)–(2).   A petitioner must show that the state court unreasonably applied the holdings of this Court's decisions, not mere dicta.   See *White* v. *Woodall*, 572 U. S. 415, 419.   When this Court relies on a legal principle to decide a case, that principle is a "holding" of the Court for purposes of AEDPA.

   The legal principle on which Andrew relies—that the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial—was indispensable to the Court's decision in *Payne* v. *Tennessee*, and was thus a holding of this Court for purposes of AEDPA.   In *Payne*, this Court considered

whether to overrule a set of prior cases that had categorically barred the introduction of victim impact evidence during the sentencing phases of a capital trial. The Court concluded that a categorical bar was not necessary to protect defendants because another protection (the Due Process Clause) remained available to challenge the introduction of evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair." 501 U. S., at 825 (citing *Darden* v. *Wainwright*, 477 U. S. 168, 179–183). Importantly, *Payne* broke little new ground in recognizing that the Due Process Clause protects against the use of unduly prejudicial evidence. See, *e. g.*, *Donnelly* v. *DeChristoforo*, 416 U. S. 637; *Caldwell* v. *Mississippi*, 472 U. S. 320, 338–340; *Darden*, 477 U. S., at 178–183. If the Tenth Circuit thought itself constrained by AEDPA to limit *Payne* to its facts, it was mistaken. General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court. See *Lockyer* v. *Andrade*, 538 U. S. 63, 72. Although this Court has not previously relied on *Payne* to invalidate a conviction for improperly admitted prejudicial evidence, moreover, "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *White*, 572 U. S., at 427 (internal quotation marks omitted); see also *Taylor* v. *Riojas*, 592 U. S. 7, 9 (*per curiam*) ("'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to a specific set of facts'" (quoting *Hope* v. *Pelzer*, 536 U. S. 730, 741)). Because the Tenth Circuit held that no relevant clearly established law existed (a ruling the Court reviews *de novo*), it never considered whether the state court's application of that law was reasonable as to either the guilt or sentencing phase. The case is remanded for the Tenth Circuit to do so in the first instance.

Certiorari granted; 62 F. 4th 1299, vacated and remanded.

PER CURIAM.

An Oklahoma jury convicted Brenda Andrew of murdering her husband, Rob Andrew, and sentenced her to death. The State spent significant time at trial introducing evidence about Andrew's sex life and about her failings as a mother and wife, much of which it later conceded was irrelevant. In a federal habeas petition, Andrew argued that this evidence had been so prejudicial as to violate the Due Process Clause. The Court of Appeals rejected that claim because, it thought, no holding of this Court established a general rule that the

erroneous admission of prejudicial evidence could violate due process. That was wrong. By the time of Andrew's trial, this Court had made clear that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne* v. *Tennessee*, 501 U. S. 808, 825 (1991).

## I

### A

On November 20, 2001, Rob Andrew was fatally shot in his garage. Brenda Andrew, who herself had been shot in the arm during the incident, told the police that two armed assailants had committed the shooting. Andrew further explained that she had separated from her husband and was now dating James Pavatt, but that she and Rob continued to see each other as they had two children together.

Pavatt and Andrew traveled to Mexico together after Rob Andrew's death and soon became suspects in his murder. Eventually, Pavatt confessed to committing the shooting with a friend. Pavatt denied that Andrew had been involved. The State thereafter charged both Pavatt and Andrew with capital murder, and a jury convicted Pavatt and sentenced him to death.

At Andrew's trial, the prosecution sought to prove that Andrew had conspired with Pavatt, an insurance agent, to murder her husband for the proceeds of his life insurance policy. Among other things, the prosecution elicited testimony about Andrew's sexual partners reaching back two decades; about the outfits she wore to dinner or during grocery runs; about the underwear she packed for vacation; and about how often she had sex in her car. At least two of the prosecution's guilt-phase witnesses took the stand exclusively to testify about Andrew's provocative clothing, and others were asked to comment on whether a good mother would dress or behave the way Andrew had. In its closing

statement, the prosecution again invoked these themes, including by displaying Andrew's "thong underwear" to the jury, by reminding the jury of Andrew's alleged affairs during college, and by emphasizing that Andrew "had sex on [her husband] over and over and over" while "keeping a boyfriend on the side." Tr. 4103, 4124–4125 (July 12, 2004). At both the guilt and sentencing phases, prosecutors contrasted Andrew with the victim, whom they asserted had been "committed to God." *Id.*, at 4124; see also, *e. g.*, Tr. 4402 (July 14, 2004) (suggesting nothing could mitigate murder of Rob Andrew because he just "wanted to love God").[1]

## B

The jury convicted Andrew and sentenced her to death.
On appeal, Andrew argued that the introduction of irrelevant evidence, including evidence "that she had extramarital sexual affairs with two other men," that she had " 'come on

Page Proof Pending Publication

[1] The dissent recites what it insists was substantial evidence of Andrew's guilt, contending in the process that this Court "inaccurately portrays" that evidence. *Post*, at 98 (opinion of THOMAS, J.). In doing so, it prejudges the prejudice analysis by characterizing as fact the State's narrative at trial. That narrative, of course, was hotly contested then and remains so now. For example, the defense elicited testimony from multiple witnesses that Andrew knew on the day of the murder that she was not the beneficiary on the life insurance policy. The Oklahoma Court of Criminal Appeals (OCCA) held that the court also wrongly excluded evidence Andrew argued would cast doubt on the theory that she had staged the shooting, though the OCCA held that exclusion was harmless. *Andrew* v. *State*, 2007 OK CR 23, ¶¶89–92, 164 P. 3d 176, 197. The Court today says nothing about the strength of the evidence against Andrew because the issue of prejudice in both the guilt and sentencing phases of the trial is one for the Tenth Circuit to consider on remand. See *infra*, at 96. Similarly, the dissent asserts that Andrew falsely accuses the prosecution of calling her a "slut puppy" in closing argument. *Post*, at 103, n. 3 (opinion of THOMAS, J.). Whether the prosecution quoted something it believed Andrew once said to suggest to the jury that Andrew herself was a "slut puppy," or simply to recite an alleged abusive phone call, is a question of fact for the Tenth Circuit to resolve.

to'" another witness's sons, and that she had dressed provocatively at a restaurant, *Andrew* v. *State*, 2007 OK CR 23, ¶¶42–59, 164 P. 3d 176, 190–193, violated Oklahoma law as well as the Federal Due Process Clause. The OCCA held that admission of evidence about Andrew's extramarital affairs had been proper because it showed that "[h]er co-defendant was just the last in a long line of men that she seduced." *Id.*, at 192.[2] The OCCA "struggl[ed]," however, "to find any relevance . . . other than to show [Andrew's] character" for the remaining challenged evidence. *Ibid.* By now, the State "agree[d] that most of this evidence was irrelevant to any issue in this case." *Ibid.* The OCCA nonetheless denied relief on the ground that the trial court's errors had been harmless.

Judge Johnson dissented in part. In her view, the "egregious . . . pattern of introducing evidence that ha[d] no purpose other than to hammer home that Brenda Andrew is a bad wife, a bad mother, and a bad woman . . . trivialize[d] the value of her life in the minds of the jurors." *Id.*, at 206–207. She would therefore have vacated her sentence. Judge Chapel dissented separately, indicating that he would have reversed the conviction and remanded for a new trial. *Id.*, at 208.

---

[2] The dissent asserts that the OCCA held evidence of Andrew's "'close personal relationship'" with two of her affair partners to be relevant because it gave credence to testimony that Andrew had "'shared with both of these men her hatred for Rob Andrew and her wish that he was dead.'" *Post*, at 102 (opinion of THOMAS, J.) (quoting 164 P. 3d, at 192). Andrew never objected to evidence that she had a "close personal relationship" with these men. In fact, defense counsel stipulated that she had affairs with them. See, *e. g.*, Tr. 338 (June 18, 2004) ("We're not contesting the affair. We have never contested the affair with Nunley or Higgins"). Andrew's claim instead concerned the extensive testimony about how she flirted with these men, how she dressed around them, and how many times (and where) she had sex with them. That testimony appears to have no bearing on Andrew's alleged expressions of hatred for her husband.

Per Curiam

In federal court, Andrew reiterated her claim that the admission of this evidence rendered the guilt and penalty phases of her trial fundamentally unfair, in violation of due process. 62 F. 4th 1299, 1312–1313 (CA10 2023). The District Court denied relief. A divided Tenth Circuit affirmed because, it held, Andrew had failed to cite "clearly established federal law governing her claim." *Id.*, at 1314. The majority acknowledged that Andrew had cited *Payne*, in which this Court said that the Due Process Clause "provides a mechanism for relief" when the introduction of unduly prejudicial evidence "renders [a] trial fundamentally unfair." 501 U. S., at 825. According to the majority, however, that had been a "pronouncement," not a "holding," of this Court. 62 F. 4th, at 1314. It therefore concluded Andrew had failed to identify "clearly established federal law governing her claim," as required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Id.*, at 1316; 28 U. S. C. §2254(d)(1). As a result, the majority declined to consider whether the OCCA unreasonably applied *Payne*, *i. e.*, whether a fairminded jurist could hold that the admission of irrelevant evidence about Andrew's demeanor as a woman was not so prejudicial as to deprive her of a fundamentally fair trial. 62 F. 4th, at 1316 ("'The absence of clearly established federal law is dispositive under §2254(d)(1)'" (quoting *House* v. *Hatch*, 527 F. 3d 1010, 1018 (CA10 2008))).

In dissent, Judge Bacharach condemned the State's focus "from start to finish on Ms. Andrew's sex life," a move he argued "portrayed Ms. Andrew as a scarlet woman, a modern Jezebel, sparking distrust based on her loose morals . . . plucking away any realistic chance that the jury would seriously consider her version of events." 62 F. 4th, at 1366. Judge Bacharach therefore would have held that the combination of evidentiary errors "deprived Ms. Andrew of a fundamentally fair trial." *Id.*, at 1377.

## II

A federal court may grant habeas relief as to a claim adjudicated on the merits in state court only if the state court relied on an unreasonable determination of the facts or unreasonably applied "clearly established Federal law, as determined by" this Court. 28 U. S. C. §§ 2254(d)(1)–(2). To show that a state court unreasonably applied clearly established federal law, a petitioner must show that the court unreasonably applied " 'the holdings, as opposed to the dicta, of this Court's decisions.' " *White* v. *Woodall*, 572 U. S. 415, 419 (2014) (quoting *Howes* v. *Fields*, 565 U. S. 499, 505 (2012)). An unreasonable application, in turn, is one with which no fairminded jurist would agree. *Harrington* v. *Richter*, 562 U. S. 86, 101 (2011).

## A

When this Court relies on a legal rule or principle to decide a case, that principle is a "holding" of the Court for purposes of AEDPA. *Lockyer* v. *Andrade*, 538 U. S. 63, 71–72 (2003) ("[C]learly established Federal law . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" (internal quotation marks omitted)). Following these principles, it is clear that Andrew properly identified clearly established federal law.

In *Payne*, this Court considered whether to overrule a set of prior cases that had categorically barred the introduction of victim impact evidence during the sentencing phases of a capital trial. The Court noted that, in many circumstances, "victim impact evidence serves entirely legitimate purposes," 501 U. S., at 825, even though in others it could be prejudicial. It then concluded that a categorical bar was not necessary to protect against the risk of prejudicial testimony because "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" against the introduction of evidence "that is so unduly prejudicial that it renders

Per Curiam

the trial fundamentally unfair." *Ibid.* (citing *Darden* v. *Wainwright*, 477 U. S. 168, 179–183 (1986)).   In light of that protection, the Court held, it could permit victim impact evidence where appropriate without risking undue prejudice to defendants.   501 U. S., at 825.   In other words, the Court removed one protection for capital defendants (the *per se* bar on victim impact statements) in part *because* another protection (the Due Process Clause) remained available against evidence that is so unduly prejudicial that it renders the trial fundamentally unfair.   The legal principle on which Andrew relies, that the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial, was therefore indispensable to the decision in *Payne*.   That means it was a holding of this Court for purposes of AEDPA.

   Importantly, *Payne* did not invent due process protections against unduly prejudicial evidence.   The Court had several times before held that prosecutors' prejudicial or misleading statements violate due process if they render a trial or capital sentencing fundamentally unfair.   *Donnelly* v. *DeChristoforo*, 416 U. S. 637 (1974); *Caldwell* v. *Mississippi*, 472 U. S. 320, 338–340 (1985); *Darden*, 477 U. S., at 178–183.   *Payne* thus broke little new ground in this respect.   By the time of the OCCA's decision in this case, it was clear that the introduction of unduly prejudicial evidence could, in certain cases, violate the Due Process Clause.[3]

———————

   [3] The dissent argues that *Estelle* v. *McGuire*, 502 U. S. 62 (1991), shows otherwise because it left open whether " 'it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial.' "   *Post*, at 111 (opinion of Thomas, J.) (quoting *Estelle*, 502 U. S., at 70).   To be sure, this Court did not hold in *Payne* that the introduction of all irrelevant evidence violates the Due Process Clause.   *Payne* established, rather, that due process protects defendants from the introduction of evidence so prejudicial as to affect the fundamental fairness of their trials.   This Court squarely acknowledged that rule in *Estelle*, explaining that "the challenged evidence" at issue there did not warrant relief because it did not " 'so infus[e] the trial with

B

The Court of Appeals nonetheless held that *Payne* "merely established that the Eighth Amendment did not erect a '*per se* bar' to the introduction of victim-impact statements in capital cases." 62 F. 4th, at 1314 (quoting *Payne*, 501 U. S., at 827). As just explained, however, *Payne* expressly relied on the availability of relief under the Due Process Clause to reach that conclusion. This Court has accordingly applied *Payne*'s framework to a claim much like Andrew's: "that the introduction of [prejudicial] evidence" at the sentencing phases "violated the Due Process Clause of the Fourteenth Amendment." *Romano* v. *Oklahoma*, 512 U. S. 1, 12 (1994). More recently, the Court relied on *Payne* in the same way that Andrew sought to rely on it here: for the proposition that "the Due Process Clause . . . wards off the introduction of unduly prejudicial evidence that would render the trial fundamentally unfair." *Kansas* v. *Carr*, 577 U. S. 108, 123 (2016) (quoting *Payne*, 501 U. S., at 825; internal quotation marks and alteration omitted). This Court has also relied on the underlying fundamental fairness principle in the jury-impartiality context. See *Rideau* v. *Louisiana*, 373 U. S. 723, 726 (1963); *Skilling* v. *United States*, 561 U. S. 358, 379 (2010).

To the extent that the Court of Appeals thought itself constrained by AEDPA to limit *Payne* to its facts, it was mistaken. General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court. For example, the Eighth Amendment principle that a sentence may not be grossly disproportionate to the offense is "'clearly established' under §2554(d)(1)," even though it arises out of a "thicket of Eighth Amendment jurisprudence" and lacks "'precise contours.'"

---

unfairness as to deny due process of law.'" 502 U. S., at 75 (quoting *Lisenba* v. *California*, 314 U. S. 219, 228 (1941), and citing *Donnelly*, 416 U. S., at 643). In any event, and as recounted below, this Court has continued to rely on *Payne*'s fundamental fairness principle since *Estelle*.

*Lockyer*, 538 U. S., at 72. Although this Court has not previously relied on *Payne* to invalidate a conviction for improperly admitted prejudicial evidence, moreover, "'[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.'" *White*, 572 U. S., at 427 (quoting *Yarborough* v. *Alvarado*, 541 U. S. 652, 666 (2004)); see also *Taylor* v. *Riojas*, 592 U. S. 7, 9 (2020) (*per curiam*) ("'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question'" (quoting *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002))). The Court of Appeals thus erred by refusing even to consider whether the OCCA unreasonably applied established due process principles to Andrew's case.

The dissent maintains that a reasonable jurist could agree with the Tenth Circuit's understanding of our precedent. That assertion conflates the deference federal habeas courts must extend to a state court's "application of" this Court's precedent with the federal courts' independent obligation to first identify the relevant "clearly established Federal law." 28 U. S. C. § 2254(d)(1); *Lockyer*, 538 U. S., at 71 (identifying clearly established law "[a]s a threshold matter"). A legal principle is clearly established for purposes of AEDPA if it is a holding of this Court. *White*, 572 U. S., at 419. This Court has no occasion to defer to other federal courts' erroneous interpretations of its own precedent. Nor is such double deference necessary to prevent expansion of federal habeas relief to those who rely on "debatable" interpretations or extensions of our holdings. *Post* at 112–113 (opinion of THOMAS, J.). Andrew does not rely on an interpretation or extension of this Court's cases but on a principle this Court itself has relied on over the course of decades.

Because the Tenth Circuit nonetheless held that no relevant clearly established law existed (a ruling this Court reviews *de novo*), it never considered whether the state

court's application of that law was reasonable. On remand, the Court of Appeals should conduct that inquiry in the first instance. Specifically, the question now is whether a fairminded jurist reviewing this record could disagree with Andrew that the trial court's mistaken admission of irrelevant evidence was so "unduly prejudicial" as to render her trial "fundamentally unfair." *Payne*, 501 U. S., at 825.

The Court of Appeals must ask that question separately for the guilt and sentencing phases. As to each phase, it might consider the relevance of the disputed evidence to the charges or sentencing factors, the degree of prejudice Andrew suffered from its introduction, and whether the trial court provided any mitigating instructions. Cf. *Romano*, 512 U. S., at 13. The ultimate question is whether a fairminded jurist could disagree that the evidence "so infected the trial with unfairness" as to render the resulting conviction or sentence "a denial of due process." *Ibid.*

\*    \*    \*

At the time of the OCCA's decision, clearly established law provided that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair. This Court accordingly grants the petition for certiorari and the motion for leave to proceed *in forma pauperis*, vacates the judgment below, and remands the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO, concurring in the judgment.

I concur in the judgment because our case law establishes that a defendant's due-process rights can be violated when the properly admitted evidence at trial is overwhelmed by a flood of irrelevant and highly prejudicial evidence that renders the trial fundamentally unfair. See *Payne* v. *Tennes-*

*see,* 501 U. S. 808, 825 (1991); *Romano* v. *Oklahoma,* 512 U. S. 1, 12 (1994); cf. *Rideau* v. *Louisiana,* 373 U. S. 723, 726 (1963). I express no view on whether that very high standard is met here.

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, dissenting.

Our precedent under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) establishes several rules for identifying clearly established federal law. 28 U. S. C. § 2254(d)(1). We have instructed lower courts to avoid framing our precedents at too high a level of generality; to carefully distinguish holdings from dicta; and to refrain from treating reserved questions as though they have already been answered. The Tenth Circuit followed these rules. The Court today does not. Instead, it summarily vacates the opinion below for failing to elevate to "clearly established" law the broadest possible interpretation of a one-sentence aside in *Payne* v. *Tennessee,* 501 U. S. 808 (1991). In doing so, the Court blows past *Estelle* v. *McGuire,* 502 U. S. 62 (1991), which, months after *Payne,* reserved the very question that the Court says *Payne* resolved. And, worst of all, it redefines "clearly established" law to include debatable interpretations of our precedent. It is this Court, and not the Tenth Circuit, that has deviated from settled law. I respectfully dissent.

I

The Court's errors begin with its recitation of the facts. Contrary to the majority's insinuations, the State presented "overwhelming evidence" that Andrew participated in the murder of her husband. See *Andrew* v. *State,* 2007 OK CR 23, ¶ 56, 164 P. 3d 176, 192; accord, *id.,* at 207 (A. Johnson, J., concurring in result in part and dissenting in part). In fact, the State presented an "unusually strong evidentiary case, which leaves little or no doubt that [Andrew] is guilty of the

crimes charged, crimes committed after methodical planning." *Id.*, at 206 (Lumpkin, P. J., concurring in result). The Court inaccurately portrays the State's evidence, the prosecution's closing arguments, and the reasoning of the Oklahoma Court of Criminal Appeals (OCCA).

### A

Brenda Andrew (Andrew) married Robert Andrew (Rob) in 1984. In February 2000, Rob purchased an $800,000 life insurance policy through agent Jim Pavatt, with Andrew as the beneficiary. The Andrews and Pavatt attended the same church. Pavatt and Andrew both served as Sunday school teachers. But, by August 2001, they had begun an affair. The affair caused the Andrews' already strained marriage to reach a breaking point. Around late September Andrew initiated divorce proceedings and told Rob to move out of the house.

One morning in October, Rob discovered that someone had cut the brake lines in his car. Several hours later, he received phone calls from two unknown callers—one of whom turned out to be Pavatt's adult daughter, Janna Larson— falsely claiming that Andrew was in the hospital and urgently needed him. Phone records reveal that Pavatt and Andrew exchanged 82 phone calls that day and more than 50 calls the next day. The next day, Andrew told Rob she had read in the newspaper about his brake lines being cut, but no such news story existed. And, around this time, Pavatt told Larson that Andrew had asked him to kill Rob. Pavatt later threatened to kill her if she ever revealed this information.

After the brake-line incident, Rob sought to remove Andrew as the beneficiary of his life insurance policy, explaining to another insurance agent that he thought Pavatt and Andrew were trying to kill him. But, Andrew and Pavatt resorted to fraud to try to prevent this from happening, forging Rob's signature on a form transferring ownership of the pol-

icy to Andrew. The policy then became a serious point of contention in the divorce proceedings, even though Rob was only 38 years old and healthy.

The Andrews had two young children who, after their separation, continued to live with Andrew in the former family home. Rob would sometimes meet them outside the house and take them for visitation.

When Rob came to pick up the children for the Thanksgiving holiday, however, Andrew asked him to come into the garage to help her light the pilot light of her furnace. As he started to do so, someone pointed a 16-gauge shotgun at him from across the garage. Seeing this, Rob turned and grabbed a trash bag filled with aluminum cans, apparently in a desperate attempt to protect himself. The perpetrator shot him through the bag. Reloading the shotgun, the perpetrator (or an accomplice) then moved within three feet of Rob, and shot him a second time as he lay on the floor. Andrew was also shot with a .22-caliber weapon, but suffered only a superficial wound on her arm.

Andrew called 911 after the shootings, claiming that two masked men had come into the garage and attacked her and Rob. She related on the call that Rob was still conscious and trying to speak. By the time emergency responders arrived, however, he was dead. During the shootings, the children were in the master bedroom watching television with the volume turned up high, unaware of what was happening in the garage. An ambulance then took Andrew to the hospital, where witnesses described her demeanor as unusually calm.

Police discovered substantial evidence linking Andrew and Pavatt to the murder. Rob owned a 16-gauge shotgun, but had told friends that Andrew refused to let him take it with him when he moved out. One witness testified that, eight days before the murder, he had seen Andrew in a rural area commonly used for target practice. The witness also said that later he found 16-gauge shotgun shells at the site. Pa-

vatt owned a .22-caliber handgun, which he had purchased about a week before the murder. The day of the murder, he borrowed Larson's car, claiming he would get it serviced for her. When he returned it the following day, she noticed the car had not been serviced. And, she found a .22-caliber shell on the floorboard of her car.

Forensic evidence also undermined Andrew's account that she had been shot at a distance. Powder burns on her clothes and body revealed the shot had been fired within two inches of her arm. An expert witness later testified that Andrew's injury—a superficial, close-range gunshot wound—was staged to make it look as if she had been a victim of the attack and thereby avoid suspicion.

The Andrews' neighbors were out of town on the day of the murder. When they returned, they found suspicious items in their home and contacted the police. Police discovered that someone had left a 16-gauge shotgun shell and several .22-caliber bullets in the home, both the same brand as those used in Rob's murder. There was no evidence of a break-in, but Andrew had a key to their home. Prosecutors suggested that, after the shooting, Pavatt hid in the home until police had left the crime scene.

Rather than attend her husband's funeral, Andrew traveled with Pavatt and her children to Mexico. She apparently had no plans to return. Before the trip, Andrew tried to transfer funds from her account to Larson's, so that Larson could wire money to her and Pavatt. The pair also asked Larson to help them forge Rob's signature on a document granting Andrew permission to take the children abroad. Andrew abandoned her car in an apartment complex before leaving. She also stopped making payments on her home. Pavatt researched traveling to Argentina after hearing that Argentina did not extradite.

Larson, however, cooperated with the FBI and refused to wire Pavatt or Andrew any money, despite their repeated requests. When they ran out of money three months later,

THOMAS, J., dissenting

they returned to the United States and were immediately arrested.

While in Mexico, Pavatt wrote a letter addressed to Andrew's daughter claiming that he and an unnamed "friend" had killed Rob, and that Andrew had nothing to do with it. *Ante*, at 88.   He stated he did so because Andrew had told him four days before the murder that she planned to beg Rob to take her back after Thanksgiving.   This was a peculiar claim, given that hours before the murder Pavatt had moved his washer and dryer into her home.   And, far from adopting a conciliatory attitude toward Rob, the night before the murder Andrew had called a friend just to say, "I hate him.  I hate him.  I hate him."   Tr. 2662–2663 (July 1, 2004).   The friend recalled that the comment "made the hairs on the back of my neck stand up.  She hated that man."   *Id.*, at 2664.

## B

A jury convicted Andrew of capital murder, and she was sentenced to death.   So too was Pavatt in a separate trial. Sex and marriage were unavoidable issues at Andrew's trial, and the State introduced a variety of evidence about her sexual behavior.   On direct appeal, Andrew challenged some of the sex-based evidence introduced during the guilt phase of her trial, arguing that it was irrelevant and unduly prejudicial.[1]   Given that "this trial was primarily about the motive

---

[1] As the Court notes, in federal habeas proceedings, Andrew has "reiterated her claim that the admission of this evidence" rendered both her guilt and penalty phases fundamentally unfair.   *Ante*, at 91.   But, Andrew also objects now to the admission of certain evidence from the penalty phase, as well as items of guilt-phase evidence she did not challenge on direct appeal.   These challenges fail for lack of exhaustion.   See 28 U. S. C. § 2254(b)(1)(A).   To preserve an evidentiary claim, an Oklahoma defendant must raise a specific objection when the evidence in question is admitted. *Stemple* v. *State*, 2000 OK CR 4, ¶32, 994 P. 2d 61, 68–69.   The OCCA will review on direct appeal only those objections brought to its attention. *Stouffer* v. *State*, 2006 OK CR 46, ¶126, 147 P. 3d 245, 270.   Because Andrew did not raise these new objections in her direct appeal, she has not

and intent of [Andrew] to kill her husband with the aid of
Pavatt," the OCCA held that much of this evidence, particu-
larly concerning her relationship with Pavatt, was not just
admissible, but "highly relevant" and "probative." *Andrew*,
164 P. 3d, at 194. But, not all of it was so. The OCCA rec-
ognized that some evidence, like the sort of outfits Andrew
wore to dinner outings, was not relevant. *Id.*, at 192.
Given "the overwhelming evidence in this case," however, it
determined that the introduction of the irrelevant evidence
"was harmless." *Ibid.*

The Court suggests that the OCCA permitted evidence
of Andrew's two prior affairs simply because it showed she
had a penchant for adultery. See *ante*, at 89–90. In reality,
the OCCA concluded that this evidence helped to prove "mo-
tive and intent." *Andrew*, 164 P. 3d, at 192. Andrew
had "shared with both of these men her hatred for Rob An-
drew and her wish that he was dead." *Ibid.* Evidence that
Andrew had "a close personal relationship" with these
men gave credence to their testimony that she had re-
vealed to them these "intimate details of [her] marriage."
*Ibid.*[2]

The Court also insinuates that there was something im-
proper about the State's introduction of evidence on An-
drew's "failings as a mother." *Ante*, at 87. But, it conven-
iently omits the context. Andrew asserted that she was a
"good mother" as part of her defense in both the guilt and

_____

presented them in state court "in accordance with state procedures," and
so has not exhausted them. *Shinn* v. *Martinez Ramirez*, 596 U. S. 366,
378 (2022). Because the Court today does not address exhaustion, the
Tenth Circuit is free to do so on remand.

[2] Faced with this reasonable holding by the OCCA, the majority insists
that Andrew's claim concerned certain gratuitous details about these af-
fairs rather than the affairs' existence. *Ante*, at 90, n. 2. The truth is
just the opposite. Andrew's sole argument to the OCCA was that the
fact "[t]hat [she] had once had affairs with these men provided no evidence
of her motive" or "intent" or any other relevant fact. App. to Reply Brief
62a–64a.

penalty phases of her trial.   Tr. 62–63 (June 17, 2004); Tr. 4179 (July 14, 2004); *Andrew*, 164 P. 3d, at 205.   In presenting evidence to the contrary, the State was simply *rebutting* a point that *Andrew* had placed in issue, as it clearly is entitled to do.   See 1 R. Mosteller et al., McCormick on Evidence § 191, p. 1188 (8th ed. 2020) ("[O]nce the defendant gives evidence of pertinent character traits to show that he is not guilty, his claim of possession of these traits . . . is open to rebuttal").

During its closing argument, the prosecution did not rely on any of the sexual evidence that the OCCA would later find irrelevant.[3]   The prosecution's reference to the underwear Andrew brought to Mexico, see *ante*, at 88, is no exception. The OCCA recognized that this evidence bore on Pavatt's and Andrew's "intentions in fleeing to Mexico," a key issue in the case.   *Andrew*, 164 P. 3d, at 194.

Finally, the Court is wrong to imply that the prosecution drew any kind of "contras[t]" between Rob and Andrew in terms of religious commitment.   *Ante*, at 89.   The prosecution mentioned Rob's religious faith to emphasize that the world lost "a fine human being" when Rob was brutally murdered.   Tr. 4401–4402 (July 14, 2004).   But, the prosecution never cast any sort of religious judgment against Andrew.

_____

[3] Andrew's briefing before this Court alleges that the prosecution called her a "'slut puppy'" who is not a "'woman of God'" during its guilt-stage closing argument.   Pet. for Cert. i, 8, 11, 14 (quoting Tr. 4125 (July 12, 2004)); Pet. for Cert. Reply 5, 13 (same).   This accusation—which Andrew did not make until almost 20 years after her trial—is entirely false. The prosecutor was not referring to Andrew.   Instead, he was recounting an abusive phone call *from Andrew* to Rob, during which Andrew baselessly "accused [Rob] of having" an affair with a "slut puppy," before telling him that he "can't be a man of God and [Rob's supposed affair partner] can't be a woman of God because she's sleeping with a married man and even if you're single that's adultery, what a slut puppy she must be."   Tr. 4125.   For all its efforts to portray Andrew sympathetically, even the majority stops short of endorsing her accusation. See *ante*, at 89, n. 1.

Tellingly, the Court is unable to cite even one example of the prosecution condemning Andrew in religious terms.

The record makes clear that it was *the defense*, not the prosecution, that repeatedly appealed to the jury's religious sentiments at sentencing. For example, the defense called a pastor as a witness, who testified to the importance of "mercy" as a "biblical" value. *Id.*, at 4333. And, in its closing, the defense repeatedly quoted the Bible; said that, if Rob could speak to the jury, he would ask them to "forgive" Andrew as "Jesus Christ on the cross" forgave His killers; and concluded with a prayer. *Id.*, at 4429–4430, 4471–4473. The prosecution simply asked the jury during rebuttal to ignore the defense's attempts to "guilt trip" them. *Id.*, at 4480.

## II

The Court's legal analysis fares no better. Under AEDPA, Andrew may obtain federal habeas relief only if the OCCA's resolution of her due process claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" the holdings of this Court. 28 U. S. C. § 2254(d)(1); see *Lockyer* v. *Andrade*, 538 U. S. 63, 71 (2003). This "standard is," and "was meant to be," "difficult to meet." *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). It forecloses relief unless all "fairminded jurists" would agree that the OCCA's "decision conflicts with this Court's precedents." *Ibid.*

The Court today asserts that the Due Process Clause forbids the admission of evidence so unduly prejudicial as to render a defendant's trial fundamentally unfair, and holds that the Tenth Circuit erred in failing to recognize this rule as clearly established under our precedents. In so holding, the Court commits the error of " 'framing our precedents at' " too " 'high [a] level of generality.' " *Lopez* v. *Smith*, 574 U. S. 1, 6 (2014) (*per curiam*) (quoting *Nevada* v. *Jackson*, 569 U. S. 505, 512 (2013) (*per curiam*)). And, even setting that

THOMAS, J., dissenting

aside, this reading of our precedents is one with which fair-minded jurists could easily (and justifiably) disagree.

## A

"[H]oldings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA. *Brown* v. *Davenport*, 596 U. S. 118, 136 (2022). We have repeatedly cautioned lower courts against "framing our precedents" too generally. *Lopez*, 574 U. S., at 6 (internal quotation marks omitted); see, *e. g.*, *Woods* v. *Donald*, 575 U. S. 312, 318–319 (2015) (*per curiam*); *White* v. *Woodall*, 572 U. S. 415, 426 (2014); *Nevada*, 569 U. S., at 512; *Harrington*, 562 U. S., at 101; *Knowles* v. *Mirzayance*, 556 U. S. 111, 122 (2009). We have instead required courts to ask whether our precedents "establish clearly *the specific rule* [the prisoner] needs." *Lopez*, 574 U. S., at 6 (emphasis added). The Tenth Circuit heeded our repeated warnings. The majority disregards them.

*Payne* "h[e]ld" that "the Eighth Amendment erects no *per se* bar" to "the admission of victim impact evidence" in capital sentencing proceedings. 501 U. S., at 827. But, the Court included a caveat: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.*, at 825. Significantly, that caveat did not apply in *Payne* itself. There, as in "the majority of cases," the "victim impact evidence serve[d] entirely legitimate purposes." *Ibid.*

The Tenth Circuit correctly rejected Andrew's claim that *Payne*'s caveat clearly established that the admission of *any* evidence so prejudicial as to render a trial fundamentally unfair would violate due process. It held that *Payne*'s brief discussion of due process only "appl[ied] to scenarios in which . . . victim impact statements" are "unfairly prejudicial." 62 F. 4th 1299, 1314 (2023) (internal quotation marks omitted).

Nevertheless, the Court today vacates the Tenth Circuit's decision, marking the first time it has ever summarily set aside a lower court decision for *failing* to find that a legal rule is clearly established under AEDPA. Yet, the Court does not identify a specific on-point holding from *Payne*—or any other decision—that the Tenth Circuit overlooked. Instead, it faults the Tenth Circuit for failing to distill a "[g]eneral legal principl[e]" about fairness from *Payne*'s one-sentence due process caveat. *Ante,* at 94. In the process, the Court does not once mention, much less distinguish, our many precedents admonishing lower courts not to define clearly established law too abstractly.

This specificity requirement serves an important function. Defining clearly established law at an overly high level of generality makes it virtually impossible to find an unreasonable application warranting relief. See *Brown*, 596 U. S., at 136. It "is not 'an unreasonable application of'" a more general rule "for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles*, 556 U. S., at 122. "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White*, 572 U. S., at 426 (internal quotation marks omitted). When a legal rule is defined at too high a level of generality, it becomes impossible to apply it to the facts without articulating subsidiary legal principles that are not themselves clearly established, leaving no principled basis for granting relief under § 2254(d).

To the extent some courts nonetheless grant relief based on an overly general principle, they defy AEDPA. As we have explained, when courts use "a high level of generality" to "transform even the most imaginative extension of case law into 'clearly established Federal law,'" they wrongly perform ordinary error correction under the guise of applying § 2254(d). *Nevada*, 569 U. S., at 512. Thus, at best, today's decision will simply create an extra, unnecessary step judges

must perform before they can deny a habeas claim that is doomed to fail.  At worst, it will confuse lower courts into misapplying AEDPA's standard of review.

Consider Andrew's case.  On remand, if the Tenth Circuit properly applies AEDPA, it still will find that the state court reasonably applied the principle the Court has identified, no matter what it thinks of the specific facts of Andrew's trial. *Payne* addressed the use of victim-impact evidence at the penalty phase of a capital trial.  501 U. S., at 824–825.  Andrew challenges the admission of evidence from her guilt phase, as well as non-victim-impact evidence from her penalty phase.  "[I]t is not uncommon for a constitutional rule to apply somewhat differently at the penalty phase than it does at the guilt phase."  *White*, 572 U. S., at 421.  And, a fairminded jurist could believe that victim-impact evidence raises unique due process concerns; otherwise, the specific question whether victim-impact evidence categorically violates the Eighth Amendment would never have arisen.  So, it would be impossible for the Tenth Circuit to grant Andrew relief without impermissibly "extend[ing]" *Payne*'s "rationale."  *Id.*, at 426 (internal quotation marks omitted).

Andrew's claim also cannot survive on remand because *Payne*'s lone sentence on due process does not establish a test for determining when a trial is so infected by prejudicial evidence as to be fundamentally unfair.  It does not identify what factors a court should consider, how to weigh them, or what the gap is between, say, a garden-variety Federal Rule of Evidence 403 error and a fundamentally unfair trial.  To consider the specific facts of Andrew's trial, the Tenth Circuit would need to decide these matters for itself.  But it would then by definition be doing more than applying clearly established law.  See *Knowles*, 556 U. S., at 122.

The Court defends its reliance on a broadly defined rule of law by citing *Lockyer*, 538 U. S., at 73, which recognized as clearly established the general principle that grossly disproportionate sentences violate the Eighth Amendment.  *Ante,*

at 94–95. But, in *Lockyer* the Court denied relief, so it did not carefully consider the appropriate level of generality at which to define clearly established law. Indeed, it denied relief precisely *because* it had identified a "broad" legal principle whose "precise contours" were "unclear." 538 U. S., at 76–77 (internal quotation marks omitted). *Lockyer* also was an early AEDPA decision. In our many subsequent decisions, we have come to appreciate the need to ask whether our precedents "establish clearly *the specific rule* [the prisoner] needs." *Lopez*, 574 U. S., at 6 (emphasis added). "[H]oldings that speak only at a high level of generality" cannot "supply a ground for relief" under AEDPA. *Brown*, 596 U. S., at 136.

In an effort to show that remand will not be futile, the Court observes that clearly established law can apply to "'"new factual permutations."'" *Ante*, at 95 (quoting *White*, 572 U. S., at 427). That is true, so long as one also keeps in mind *White*'s admonition that AEDPA "does not require state courts to *extend* [our] precedent" to any arguably distinct context, as would be necessary to grant Andrew relief. *Id.*, at 426. The Court attempts to escape *White*'s strict limitation by invoking *Taylor* v. *Riojas*, 592 U. S. 7 (2020) (*per curiam*), to suggest that a "'general constitutional rule'" can be a basis for relief in an "'obvious'" case. *Ante*, at 95. But, the majority omits that *Taylor* is a qualified immunity decision, rendering it utterly inapposite. Although both qualified immunity and AEDPA impose demanding standards based on "clearly established law," the two are meaningfully different. A plaintiff overcomes qualified immunity by identifying case law "finding a [constitutional] violation under similar circumstances," *except* that in "an obvious case . . . a body of relevant case law is not needed." *District of Columbia* v. *Wesby*, 583 U. S. 48, 65 (2018) (internal quotation marks omitted). In *Taylor*, this Court found that the obviousness exception applied. 592 U. S., at 8–9. AEDPA, by contrast, permits relief only when

a state-court decision undeniably "conflicts with this Court's precedents." *Harrington*, 562 U. S., at 102.

Regardless of what we think of "the merits of the [due process] principle" that Andrew asserts, it does not warrant relief under AEDPA absent a prior Supreme Court holding that the principle "applies to the circumstances presented in this case." *Woods*, 575 U. S., at 319 (internal quotation marks omitted). There is no such holding here, and the Tenth Circuit was right to insist on one.

### B

Even setting aside the level-of-generality problem, the Court is wrong to find a clearly established rule of law. For at least three reasons, a fairminded jurist could disagree with the Court's reading of *Payne*. The Court holds otherwise only by redefining "clearly established" law to include debatable interpretations of our precedents.

### 1

First, a fairminded jurist could conclude that *Payne*'s lone sentence on due process is not a holding at all. Although *Payne* asserted that victim-impact evidence could violate due process if it was unduly prejudicial, the Court found that "in this case" the evidence "serves entirely legitimate purposes," and so declined to disturb the capital sentence under review. 501 U. S., at 825. The Court's statement that a different case presenting different facts could violate due process was thus dicta because it was not "'*necessary* to'" its "disposition of [the] case." *Tyler* v. *Cain*, 533 U. S. 656, 663, n. 4 (2001) (quoting *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 67 (1996)); see *Stewart* v. *Winn*, 967 F. 3d 534, 539 (CA6 2020) (describing *Payne*'s due process discussion as a "snippe[t]" of "'dicta'"). As we have previously recognized, because "'clearly established [f]ederal law' . . . 'refers to the *holdings*'" of this Court, Andrew cannot premise her habeas claim on "a case in which we *rejected* a due process claim."

*Metrish* v. *Lancaster*, 569 U. S. 351, 367 (2013) (alteration in original).

The Court insists *Payne*'s due process statement was "indispensable" to its disposition, because without the existence of a due process backstop, the *Payne* Court might have determined that a categorical Eighth Amendment bar on victim-impact evidence is necessary to protect defendants. *Ante*, at 93. But, this is hardly the only "reasonable interpretatio[n]" of *Payne*, which nowhere sets forth the reasoning the Court ascribes to it. *White*, 572 U. S., at 423. The Court's interpretation makes sense only if we assume that the *Payne* Court would have seriously considered holding victim-impact evidence categorically unconstitutional despite it "serv[ing] entirely legitimate purposes" in "the majority of cases." 501 U. S., at 825. That would be a highly unusual approach to constitutional litigation. Cf. *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) (requiring that a law be valid in "no set of circumstances" to be facially unconstitutional). Another reasonable interpretation—and indeed, a far more plausible one—is that the Court simply wanted to make clear that its rejection of a categorical rule against victim-impact evidence did not rule out future fact-specific challenges. That kind of dicta is common in cases rejecting categorical challenges. See, *e. g.*, *United States* v. *Hansen*, 599 U. S. 762, 784–785 (2023). A fairminded jurist need not agree that *Payne*'s single-sentence caveat constitutes a holding.

2

Even if we were to treat *Payne*'s sentence about due process as a holding, a fairminded jurist need not read it as broadly as the Court does. "[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they . . . ought not to control the judgment in a subsequent suit." *Cohens* v. *Virginia*, 6 Wheat. 264, 399 (1821). This principle applies with special force when a party claims "a

single sentence" in an opinion establishes a broad legal principle. See *Arkansas Game and Fish Comm'n* v. *United States*, 568 U. S. 23, 35 (2012).

A fairminded jurist could believe that the scope of any holding established by *Payne*'s cursory discussion of due process is limited to *Payne*'s analysis. On the majority's telling, *Payne* eliminated a categorical Eighth Amendment prohibition *on victim-impact evidence* because of the availability of an alternative due process protection *against such evidence*. See *ante*, at 92–93. Because *Payne* was not considering the role of due process vis-à-vis any other kind of evidence, a fairminded jurist could conclude that any due process holding laid down by *Payne* extends only to victim-impact evidence.

3

Finally, a fairminded jurist could rely on this Court's later decision in *Estelle* to conclude that *Payne* did not establish any general due process prohibition on the admission of unduly prejudicial evidence.

The Court of Appeals in *Estelle* granted habeas relief on the ground that the admission of irrelevant and prejudicial prior-bad-act evidence had helped render the prisoner's trial "fundamentally unfair in violation of due process." 502 U. S., at 67 (internal quotation marks omitted). This Court reversed, holding the evidence in question "was relevant to an issue in the case." *Id.*, at 70. Having reached this conclusion, the Court added that "we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial." *Ibid.* That is, the *Estelle* Court expressly reserved the very question the majority asserts *Payne* resolved. This Court is "hardly in the habit of reserving separate questions that have already been definitively answered." *White*, 572 U. S., at 424 (citation, alteration, and internal quotation marks omitted). Thus,

"fairminded jurists could conclude that [*Estelle*]'s reservation regarding" unduly prejudicial evidence "would have served no meaningful purpose if [*Payne*] had created [a] rule against" it already. *Ibid.*; accord, *Kernan* v. *Cuero*, 583 U. S. 1, 8 (2017) (*per curiam*).

The law has not changed since we decided *Estelle*. The Court cites several decisions postdating and predating *Payne* and *Estelle*, but only for vague, atmospheric support. See *ante*, at 93–94. The Court does not assert that any of them establishes a general due process rule against unduly prejudicial evidence. And, the Court does not explain what work, if any, these citations do in its analysis. Nor could it. Our decision in *Romano* v. *Oklahoma*, 512 U. S. 1, 13–14 (1994), cannot move the needle because *Romano rejected* a due process claim. The reference to due process in *Kansas* v. *Carr*, 577 U. S. 108, 123 (2016), also is not a holding. As in *Payne*, it is a one-sentence aside in a case rejecting an Eighth Amendment claim. Regardless, *Carr* has no possible bearing on this case, as it was decided after the conclusion of Andrew's direct appeal. See *Lockyer*, 538 U. S., at 71–72. So too, the Court's remaining citations are clearly inapposite, as none involves the admission of evidence. As the Tenth Circuit correctly recognized, this Court has never answered the question it reserved in *Estelle*. 62 F. 4th, at 1315.

4

Remarkably, the Court does not deny that "a reasonable jurist could agree" that *Payne* does not establish the principle Andrew asserts. *Ante*, at 95. Instead, it maintains that the potentially differing views of reasonable, fairminded jurists do not matter. According to the majority, federal habeas courts have an "independent obligation" to identify the holdings of this Court. *Ibid.* Only afterward does "deference" kick in. *Ibid.*

That view is patently wrong. AEDPA requires state prisoners to base their claims on "'clearly established'" law. *Ibid.* (quoting §2254(d)(1)). A debatable holding does not *clearly* establish anything. AEDPA permits relief only when "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U. S., at 103. If one could fairly disagree that the rule a prisoner invokes is part of "existing law," one could fairly disagree that the state court erred under existing law.

Our precedents confirm that debatable readings of this Court's cases cannot be clearly established law. In *White*, we held that *Estelle* v. *Smith*, 451 U. S. 454 (1981), did not clearly establish the prisoner's asserted rule, because other "perfectly reasonable interpretations of *Estelle*" existed. 572 U. S., at 423. In other words, the prisoner's claim failed because "fairminded jurists could conclude" that *Estelle* had not "created [the] across-the-board rule" he invoked. 572 U. S., at 424. To find clearly established law in the face of these reasonable alternative interpretations would "contraven[e] §2254(d)'s deferential standard of review." *Id.*, at 423–424. Likewise, in *Kernan*, we reversed after the Ninth Circuit held that our decision in *Santobello* v. *New York*, 404 U. S. 257 (1971), clearly established the rule on which the prisoner relied. See 583 U. S., at 6–9. Because "'fairminded jurists could disagree' with the Ninth Circuit's reading of *Santobello*," we were "unable to find in Supreme Court precedent that 'clearly established federal law'" that the Ninth Circuit had claimed to see. *Id.*, at 7–8. Thus, contrary to what the majority says, we have extended "deference" both at the threshold step of identifying clearly established law and at the subsequent step of applying it. *Ante*, at 95. A contestable interpretation of precedent cannot be clearly established law.

\*      \*      \*

Summary vacatur "is a rare disposition." *Schweiker* v. *Hansen*, 450 U. S. 785, 791 (1981) (Marshall, J., dissenting). This Court has traditionally reserved it for the uncommon "situations in which the law is settled and stable, the facts are not in dispute, and the decision below is clearly in error." *Ibid.* Today, however, the Court turns this approach on its head, steamrolling settled AEDPA principles to set aside an entirely correct Tenth Circuit decision. I respectfully dissent.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None