Filed 10/31/25  P. v. Capiendo CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>LUZON MATTHEW MARTIN CAPIENDO,<br><br>　　　Defendant and Appellant. | B337068<br><br>(Los Angeles County Super. Ct. No. KA118273) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Vacated in part and affirmed in part.

　　　Boyce & Schaefer, Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Chelsea Zaragoza, Deputy Attorneys General, for Plaintiff and Respondent.

In May 2018, a group of five men beat, abducted, and ultimately killed Julian H.-A.[1] (Julian), dumping his body in Azusa Canyon. After most of the assailants pled guilty to various charges, a jury convicted defendant and appellant Luzon Matthew Martin Capiendo (defendant) of murder (Pen. Code § 187, subd. (a); count 1)[2] and kidnapping. (§ 207(a); count 3) As to the murder conviction, the jury found that defendant committed the offense during a robbery and kidnapping (§ 190.2, subd. (a)(17)); intentionally killed the victim by lying-in-wait (§ 190.2, subd. (a)(15)); and personally used a weapon (§ 12022, subd. (b)(1)). Defendant was sentenced to life in prison without the possibility of parole (LWOP).

On appeal, defendant contends (1) the trial court erred in admitting statements that three of his confederates made during *Perkins* operations;[3] (2) insufficient evidence supports the robbery-murder and lying-in-wait special circumstance findings; (3) the trial court improperly instructed the jury on the kidnapping special circumstance finding; and (4) one juror should have been investigated and discharged for improper cell phone use during trial. We vacate the robbery-murder special circumstance finding for lack of sufficient evidence. We otherwise affirm the judgment. Because the lying-in-wait and

---

[1] Per California Rules of Court, rule 8.90(b), we initially identify the victim and his family members "by first name and last initial," and thereafter by first names, to protect their privacy. No disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] In a "Perkins operation," a suspect is placed in a cell with an undercover law enforcement agent, and their conversation is audio recorded. (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

kidnapping-murder special circumstance findings remain intact, our conclusion has no effect on defendant's sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Charges

On March 25, 2019, the District Attorney of the County of Los Angeles (the District Attorney) filed an information charging defendant with murder (§ 187, subd. (a); count 1), robbery (§ 211; count 2), and kidnapping (§ 207, subd. (a); count 3). The information also alleged that defendant committed the murder during the robbery and kidnapping (§ 190.2, subd. (a)(17)); defendant intentionally killed Julian by means of lying-in-wait (§ 190.2, subd. (a)(15)); and defendant personally used weapons (i.e., a rock and a broken glass pipe) to kill Julian (§ 12022, subd. (b)(1)).

In a separate information filed under the same case number, the District Attorney charged defendant's four confederates, Hercules Dimitrios Balaskas (Balaskas), Francisco Amigon (Amigon), Jacob Hunter Elmendorf (Elmendorf), and Andrew Joseph Michael Williams (Williams),[4] with the same offenses.

### II. The Codefendants

Amigon, Elmendorf, and Williams all entered guilty pleas prior to September 2023, before defendant's trial.[5] Williams agreed to cooperate in the prosecution of defendant. It is unclear from the appellate record how the case against Balaskas was resolved though he was not tried with defendant.

---

[4] Williams also used the name "Zeus Lopez."

[5] Williams pled guilty to voluntary manslaughter (§ 192, subd. (a)), robbery (§ 211), kidnapping (§ 207, subd. (a)), and assault likely to produce great bodily injury (§ 245). Elmendorf and Amigon each pled guilty to voluntary manslaughter (§ 192, subd. (a)).

3

**III. Trial**

**A.** *Defendant and Williams Devise a Plan*

Williams testified that, on or about May 18, 2018, defendant told Williams he suspected Julian of stealing drugs from him. Williams testified that the pair equally developed a plan to get defendant's drugs back. According to Williams, they planned "to drug [Julian]; and then . . . take him to an empty lot, somewhere where it's private, beat him, and then go back and take whatever he had at wherever he was living."

Williams testified that he and defendant "outreached to Amigon and Elmendorf and brought them into [the plan]." Over Williams's objection, defendant asked Balaskas to join them, in part because Balaskas "ha[d] a [white Mitsubishi] truck so it[] [would be] kind of easier to do whatever we had to do." Williams testified that defendant invited Julian to his home to "kick it" or "hang out a little bit" on Monday, May 28, 2018.

**B.** *Defendant and Balaskas Meet*

On the morning of May 28, 2018, defendant messaged Balaskas on Facebook, telling him "imma [sic] need you on stand by in case it happens tonight it may happen tomorrow." Balaskas responded, "[a]ye, wasn't it suppose [sic] to happen tonight tho? [sic]" Defendant reiterated that "[i]t could happen tonight or tomorrow but yo let's smoke."

Balaskas agreed to come to defendant's house, planning to arrive at around 12 p.m. Defendant told him, "I'll see you in a bit that monster were [sic] gonna beat in the game is gonna be hella easy to slay."

**C.** *Williams Checks in with Balaskas*

At around 3:30 p.m., Williams texted Balaskas "[a]ye what's going on over there . . . . [¶] Someone gots to keep us posted." About an hour later, Balaskas responded "[i]ght aye I'll let you [k]now."

Williams told Balaskas to "ask [defendant] if he wants us to go [right now]." Balaskas said "[y]a I'll [let you know] when he . . . [¶] K[O]s [i.e., "knocked out"]." Williams responded "[for sure for sure] [let me know] and I need the add[ress]." Balaskas

4

said "I might knock him out [right now][,]" texted defendant's address to Williams, and reiterated "I'll [let you know] when."

Over the next hour, Williams repeatedly texted and called Balaskas, telling him "we ready." At 6:30 p.m., Williams texted Balaskas "[w]e going over at 7 you foos been lagging I don't got time to waste."

Williams, Amigon, and Elmendorf headed to defendant's house in Amigon's Honda. When they arrived at around 8:15 p.m., Williams texted Balaskas that they were outside; Balaskas did not reply.

### D. *Defendant and Balaskas Pick Julian Up*

Julian's sister, Jasmine H.-A. (Jasmine), testified that on the night of May 28, 2018, a white pickup truck pulled into the driveway of her family's home. Two men, who Jasmine later identified as defendant and Balaskas, walked towards the house and told Jasmine that they were there to pick up Julian. Jasmine relayed the message to Julian. He said "okay[,]" got in the truck, and left with defendant and Balaskas.

### E. *Julian Is Beaten in Defendant's Bedroom*

#### 1. *Defendant's roommate's testimony*

Defendant's roommate, Umesh Brahmanabally (Brahmanabally), testified that at around 9 p.m. on the night of May 28, 2018, he was in the kitchen with earphones in, "talking to [his] brother on the phone[,]" when he heard "some weird noises." He heard someone loudly "moaning or crying." Another roommate, Andres Edwards (Edwards), walked up to defendant's bedroom door and shouted at him to keep the noise down.

Over the next two to five minutes, the noises got louder. Brahmanabally "was terrified, and . . . d[id]n't know what to do."

Brahmanabally testified that "[a]fter some time, [defendant] came out of his room." There was "blood on him . . . . [¶] [e]verywhere." Defendant was "drenched in blood from his head all the way to his socks[,] which were leaving bloody footprints as he walked."

Defendant said "I'm cool[,]" and walked past Brahmanabally and Edwards to the kitchen sink. Another man,

5

who Brahmanabally later identified as Balaskas, followed defendant out of the room. Balaskas had blood on his right hand.

Brahmanabally and Edwards told defendant " '[w]hatever you are doing, take it outside.' " They then packed their belongings, left the home, and called their landlord.

2. *Williams's testimony*

After arriving at the house at around 8:15 p.m., Williams, Amigon, and Elmendorf stayed in the car "across the street" from defendant's home for "45 minutes to an hour." At that point, the trio heard a noise that "sounded like a cat being tortured." Williams ran up to the house to look in defendant's bedroom window, but the lights were off.

Williams called out for Balaskas; the lights turned on, and Williams "s[aw] blood everywhere" and Julian curled "on the bed" in a fetal position "crying out."

Williams saw defendant standing over Julian, and Balaskas standing nearby "freaking out." Williams immediately understood that defendant and Balaskas were "in the process of beating" Julian.

When Williams saw defendant's roommate walk up to defendant's room, he ran back to Amigon and Elmendorf. Williams tried to encourage them to leave, but they refused. Williams then ran back to the window and saw defendant "hitting [Julian] around the shoulder area." Williams saw blood "all over [defendant's] shirt[,]" "all over his arms[,]" "and then everywhere else . . . like on the floor and all that." Julian did not appear to be fighting back.

F. **Defendant and His Confederates Abduct Julian**

Williams testified that Balaskas came out of the house and asked the trio to help him and defendant. Williams waited in the car while Amigon and Elmendorf went in with Balaskas. He watched as Amigon, Balaskas, Elemendorf, and defendant walked out of the house carrying "what [he] believe[ed] was [Julian] . . . wrapped in some type of fabric" and loaded Julian into the truck.

6

Williams testified that defendant and Balaskas got in the truck and drove off; he, Amigon and Elmendorf followed in the Honda. The caravan eventually stopped at a dark, abandoned spot along Azusa Canyon. A license plate reader captured Balaskas' truck entering the canyon at 9:43 p.m., followed eight seconds later by Amigon's Honda.

### G.  *Julian Is Beaten and Dumped in Azusa Canyon*

Williams testified that he opened the truck bed, grabbed Julian by his feet, and dragged him to the ground. The five conspirators began beating Julian for a second time, throwing "a lot of rocks" at him.

During the beating, Williams heard Julian say "I'm sorry" and "Why are you doing this?" Julian stopped talking when Williams kicked and stomped on his head. Amigon took Julian's wallet from his pants pocket; several of the group, including Williams, went through it and found nothing worth taking. Someone put the wallet in their pocket and took it with them. No wallet was found on Julian's body or in the canyon.

Williams testified that he pushed Julian over the edge of the canyon. Wearing Williams's boots to improve his traction, defendant then went down the steep embankment to conceal Julian's body, but quickly "got stuck" on the cliff.

Shortly thereafter, Williams saw "a cop car pass[]" and ran back to the Honda. Elemendorf and Amigon followed him, and the trio fled to Williams's apartment.

### H.  *Defendant and Balaskas Rejoin the Group*

#### 1.  *Williams's testimony*

Defendant and Balaskas arrived at Williams's apartment 20 minutes later and said that a "cop" had approached them in the canyon, and they claimed their car had broken down. Defendant and Balaskas got the truck towed, then got a ride to Williams's apartment.

#### 2.  *The officer's testimony*

Sergeant David Salazar (Salazar) of the Los Angeles County Sheriff's Department (the Sheriff's Department) testified that at roughly 10:00 p.m., he was driving through Azusa Canyon

7

when he saw two cars, including a white truck, parked haphazardly on the side of the road. By the time he turned around to check on them, only the white truck remained. Sergeant Salazar saw a man standing next to the truck and "asked if he was okay." The man "said he was having brake issues and was going to call for a tow."

### 3. *The tow truck driver's testimony*

Martin Gilbert Ramirez, Jr. (Ramirez), a tow truck driver, was dispatched to Azusa Canyon on the night of May 28, 2018. He picked up defendant and Balaskas. During their ride, Ramirez noticed that defendant had dried blood on his hand.

Ramirez asked defendant and Balaskas what happened to their car. Defendant initially said that the truck broke down, but then the story "changed to we really didn't break down[,] [w]e lost our keys" while "playing keep away."

Ramirez described defendant's "demeanor" as "a little subdued, like he was kind of melancholy in a sense." Ramirez overheard defendant tell Balaskas that he would "clean up the mess."

### I. *Julian's Body Is Recovered*

On May 30, 2018, an investigator found blood on a metal railing alongside a stretch of Azusa Canyon. Upon closer inspection, the investigator found more blood on the ground. Looking over the hillside, she "saw a sneaker down in the bushes . . . 15 to 20 feet down the embankment." A search and rescue team recovered Julian's body. Investigators also recovered a bloody hiking boot.

Julian sustained at least 44 wounds on his face and neck. He had an additional 11 wounds on his body. An autopsy concluded that he died from multiple blunt force trauma.

### J. *The Perkins Operations*

Balaskas, Elmendorf, and Amigon were arrested within two days of the murder. While the three men were in custody, law enforcement officers conducted *Perkins* operations on each of them individually. The trial court admitted the statements made by Elmendorf, Amigon, and Balaskas as declarations against

8

interest.[6]  (Evid. Code § 1230.)  Recordings of the *Perkins* operations were played for the jury at trial.

During the *Perkins* operations, all three men confirmed that their original plan was to rob Julian.  They also talked about defendant's role in the beatings.

### K.    *The Physical Evidence*

The Sheriff's Department collected DNA evidence from defendant's house, Azusa Canyon, and the white Mitsubishi truck.  A criminalist from the Sheriff's Department testified that blood statistically likely to have been from defendant and Julian was recovered from various locations within defendant's house, including the bedroom.[7]  The criminalist testified that blood statistically likely to have been from defendant and Julian was found in different places at the Azusa Canyon crime scene.  The criminalist further testified that a mixture of blood statistically likely to have been from both defendant and Julian was found in the bed and on the tailgate of Balaskas's truck.[8]

---

[6] The trial court initially admitted the *Perkins* statements in September 2021, when Amigon, Balaskas, and Elmendorf were still codefendants.  It reaffirmed that ruling prior to trial over defendant's objections.

[7] Blood was spattered across the walls and floors of defendant's house, and defendant's bed was saturated in blood.  The kitchen floor was covered in bloody footprints.  The Sheriff's Department also recovered blood from a pot, a rock, a "glass vessel," and a folding chair.

[8] The criminalist testified in terms of statistical likelihood because no expert can testify that DNA "matches" a specific individual with 100 percent certainty.  The criminalist testified that blood recovered in this case was 200 octillion times more likely to have been from defendant than an unknown individual.

## IV. Conviction, Sentencing, and Appeal

On November 16, 2023, the jury convicted defendant on counts 1 (murder) and 3 (kidnapping). The jury acquitted defendant on count 2 (robbery), but found true the allegations that he committed murder while engaged in both robbery and kidnapping.[9] The jury also found true the allegations that defendant personally used a weapon and committed the murder by means of lying-in-wait.

On February 2, 2024, the trial court sentenced defendant to LWOP on the murder conviction. The court imposed and stayed an aggregate six-year sentence for the kidnapping conviction and weapons use allegation.

Defendant timely appealed.

## DISCUSSION

## I. Admission of the *Perkins* Statements Was Harmless Error

Defendant contends that the trial court should have excluded as hearsay all statements made by Balaskas, Amigon, and Elmendorf during their respective *Perkins* operations (the *Perkins* statements). The People concede—and we agree—that the *Perkins* statements were erroneously admitted as declarations against interest. (Evid. Code § 1230.) Under that statutory exception to the hearsay rule, among other things, the declarants must be unavailable to testify at trial. (*Ibid.*) Although Amigon, Balaskas, and Elmendorf were unavailable while joined as codefendants, there is no indication that they remained unavailable after the case was resolved against them.

The People argue that defendant forfeited this claim. Prior to trial, defendant renewed his prior objections to the admission of the *Perkins* statements, arguing, inter alia, that since the codefendants were "no longer here . . . their statements cannot be used" per the Confrontation Clause. The trial court overruled

---

[9] The jury could not reach a verdict on the lesser included offense of attempted robbery.

defendant's objection because the *Perkins* statements are nontestimonial. Although defendant did not clearly articulate the issue he now raises on appeal, he nevertheless argues that he made a sufficient record before the trial court to preserve the issue for appeal.

We need not resolve whether defendant forfeited this issue because admission of the *Perkins* statements was harmless error. The erroneous admission of nontestimonial hearsay is reviewed under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619; see also *People v. Valencia* (2021) 11 Cal.5th 818, 840 (*Valencia*).)[10] "That test inquires whether 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Ibid.*)

Here, the evidence of defendant's guilt is overwhelming. One of defendant's accomplices, Williams, testified that at a minimum, defendant (1) conspired to beat Julian; (2) invited Julian to his home and brutally assaulted him; (3) traveled in the truck with Balaskas and Julian to Azusa Canyon; (4) helped dump Julian's body at the bottom of the canyon; and (5) lied to third parties about why he had been in the canyon.

The dispositive parts of Williams's testimony are amply corroborated by independent evidence connecting defendant to the crime. (See § 1111; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1155 (*Johnsen*).) On the day of the murder, defendant, Balaskas, and Williams exchanged Facebook and text messages suggesting they planned to harm someone that day. Julian's sister testified that defendant and Balaskas picked Julian up that night.

Defendant's roommate testified that at around 9 p.m., he heard loud moaning and crying, following which defendant subsequently exited his bedroom covered in blood. There were bloody footprints throughout the house; blood was recovered from other objects within the house; and defendant's mattress was

---

[10] Defendant concedes that the *Perkins* statements are nontestimonial.

11

saturated in blood.  The blood in defendant's house was statistically matched to both defendant and Julian.  A mixture of blood statistically matching defendant and Julian was found in Balaskas's truck, which was photographed entering the canyon.  Blood statistically matching both defendant and Julian was recovered from different locations at the Azusa Canyon crime scene.

Both Sergeant Salazar and Ramirez confirmed that defendant and Balaskas were still at the canyon after the Honda had departed.  Ramirez testified that defendant lied that he had been in the canyon because the truck broke down.  (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 189 ["untrue statements made by defendants to" a person whom they asked for a ride "regarding [their] travels . . . tended to establish that [they] were attempting to conceal th[eir] crimes"].)  Defendant also told Balaskas that he would "clean up the mess[,]" further indicating consciousness of guilt.  (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497 ["[T]he courts have long held ' "[a]ny conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible[.]" ' "].)

Given this overwhelming evidence, it is not reasonably probable that exclusion of the *Perkins* statements would have led to a more favorable result for defendant.[11]  (*Valencia, supra,* 11 Cal.5th at p. 840.)

Defendant suggests that the *Perkins* statements so " 'infected the trial with unfairness' as to render the resulting conviction or sentence 'a denial of due process.' "  Similarly, he

---

[11] As suggested by section II.C below, the *Perkins* statements' descriptions of the alleged robbery conspiracy arguably prejudiced defendant with respect to the robbery-murder special circumstance finding.  However, since we vacate that finding on appeal, there is no prejudicial impact on defendant's conviction or sentence.

urges that his constitutional right to confrontation was violated because the *Perkins* statements did not " 'fall[] within a firmly rooted hearsay exception' " and were not "cloaked with 'particular[] guarantees of trustworthiness.' " Not so;" '[t]he erroneous admission of hearsay evidence alone does not establish a violation of the confrontation clause of the Sixth Amendment" or "other federal constitutional rights.' " (*People v. Jasso* (2025) 17 Cal.5th 646, 679.) And in any event, we are not persuaded that the *Perkins* statements, which are largely cumulative of Williams's testimony and other properly admitted evidence, rise to the level of unfairness required to establish a constitutional violation.[12]

Lastly, defendant contends that the prosecution's heavy reliance on the *Perkins* statements proves their prejudicial impact on his trial. Given the ample other evidence of defendant's guilt, we disagree. (Cf. *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1487 [prosecutorial reliance on inadmissible evidence established prejudice when "[t]he remaining evidence of [the defendant's] involvement in [the charged] killing was mainly circumstantial"]; *People v, Mujica* (1967) 251 Cal.App.2d 554, 559 ["When the extrajudicial statement of a codefendant" implicating the defendant "is [erroneously] admitted in evidence[,] . . . *and the other evidence as to the guilt of the [defendant] presents a close question*, the error must be considered as prejudicial" (italics added)].)

## II.   Sufficiency of the Evidence

Defendant argues that insufficient evidence supported both the lying-in-wait and robbery-murder special circumstance findings. While there is sufficient evidence to support the lying-

---

[12] The case defendant cites for this proposition is inapposite. (See *Andrew v. White* (2025) 604 U.S. 86, [holding that habeas relief was available for a defendant whose prosecution was arguably rendered unfair by the prosecution's focus on irrelevant evidence of her "loose morals"].)

in-wait finding, we agree that the robbery-murder finding should be vacated.

### A.   *Standard of Review*

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]  Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt.  [Citation.]  These same standards apply to challenges to the evidence underlying a true finding on a special circumstance.  [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

### B.   *Sufficient Evidence Supports the Lying-In-Wait Special Circumstance Finding*

"[A] defendant who is found guilty of murder in the first degree" is subject to LWOP if he "intentionally killed the victim by means of lying in wait."  (§ 190.2, subd. (a)(15).)

The " 'lying-in-wait special circumstance requires " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . ." ' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 629 (*Johnson*).)

On appeal, defendant challenges only the first prong of this test, arguing that the jury could not find concealment of purpose because "[t]here was no evidence or testimony how the altercation and beating of [Julian] began in [defendant's] bedroom."  This is not relevant.  "The element of concealment is satisfied by a showing that a defendant's true intent and purpose were concealed by his actions or conduct." (*People v. Stevens* (2007) 41 Cal.4th 182, 202 (*Stevens*).)  "The concealment . . . ' "is that which puts the defendant in a position of advantage, from

14

which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise." ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 632 (*Johnson*).)

Here, the record shows that defendant invited Julian to his home to facilitate a surprise attack. When defendant and Balaskas picked Julian up on the day of the murder, Julian willingly left with them, suggesting that defendant concealed his true intentions. (*Johnson*, *supra*, 62 Cal.4th at p. 632 ["A reasonable jury could have inferred that [the victim] would not have gone with defendant and placed himself in [the area of the assault] unless he believed . . . doing so" would benefit him]; see also *Stevens*, *supra*, 41 Cal.4th at p. 203 [a victim's voluntary compliance with defendant's invitation demonstrates that the defendant "lur[ed] [the] victim . . . into a vulnerable position by creating or exploiting a false sense of security"].) This is sufficient to support the lying-in-wait special circumstances finding.

### C. *The Robbery-Murder Special Circumstance Finding Is Not Supported by Sufficient Evidence*

"[A] defendant who is found guilty of murder in the first degree" is also subject to LWOP if "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, . . . or attempting to commit, . . . [¶] [r]obbery." (§ 190.2, subd. (a)(17)(A).) At trial, the prosecution argued that defendant and his confederates conspired to rob Julian. The conspiracy could be proven by establishing, inter alia, an agreement to commit robbery and one of several enumerated overt acts.[13]

---

[13] The overt acts needed to prove the robbery conspiracy include: (1) defendant and Balaskas "pick[ing] Julian . . . up from his residence" and "dr[iving] [him] to [defendant's residence];" (2) defendant and Balaskas drugging Julian "in an attempt to render him unconscious;" (3) defendant assaulting Julian; (4) Amigon loading Julian into the truck; (5) Balaskas driving defendant to Azusa Canyon with Julian in the truckbed; (6) Amigon driving

15

The only admissible evidence that defendants agreed to rob Julian is Williams's testimony to that effect. And the only admissible evidence that a robbery actually occurred comes from Williams testimony that some of the codefendants eventually took Julian's wallet from him, scanned it for valuables, and kept it. However, it is well-settled that " ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.)

As the People admit, the only other evidence of a conspiracy to robbery are "Elmendorf's and Amigon's *Perkins* statements." Such evidence cannot corroborate Williams's testimony, because "[t]he required corroboration must come from a source other than another accomplice."[14] (*People v. Price* (1991) 1 Cal.4th 324, 444, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161.)

The record does not otherwise suggest a conspiracy to commit robbery. The Facebook messages between defendant and Balaskas suggest a prior agreement to *attack* Julian, but do not indicate a plan to rob him. And, while independent evidence does verify several of the enumerated overt acts needed to prove the robbery conspiracy (e.g., defendant and Balaskas picking Julian up from his home), none of those acts specifically relates to a robbery.

The People urge us to defer to the jury's findings, since the trial court instructed that accomplice testimony could not be

---

Williams and Elmendorf to Azusa Canyon; (7) Williams pulling Julian out of the truckbed; (8) the conspirators assaulting Julian at Azusa Canyon; (8) Williams pushing Julian over the edge of the canyon; and (9) defendant going into the canyon to push Julian further down into the canyon.

[14] Because this principle precludes the *Perkins* statements as a source of corroboration, we do not reach the People's argument that inadmissible evidence can be used for that purpose.

16

relied upon without independent corroboration. But, as the People acknowledge, juries are presumed to follow their instructions "[u]nless the record shows otherwise." (See *People v. Cowan* (2010) 50 Cal.4th 401, 492 (*Cowan*).) This record lacks any independent evidence which the jury could have used to corroborate Williams's testimony.

We thus find that the robbery-murder special circumstance finding is not supported by substantial evidence and must be vacated. However, because the lying-in-wait and kidnapping-murder special circumstance findings remain intact, our conclusion has no effect on defendant's sentence. (§ 190.2, subd. (a) [only one special circumstance needed to impose LWOP].)

## III. The Instructional Error Was Harmless

Defendant contends that the trial court erred in giving the jury contradictory instructions on kidnapping felony murder. The People concede that, given the prosecution's ambiguous theory of liability for that charge, the court erred by giving both CALCRIM Nos. 703 (intent requirement for felony murder) and 731 (kidnapping felony murder).

Kidnapping felony murder can be proven in one of two ways: (1) the defendant harbored a specific intent to kill and the kidnapping was committed primarily or solely to facilitate murder (§ 190.2, subd. (a)(17)(M)); or (2) the defendant aided and abetted a kidnapping for a purpose other than murder and was a major participant acting with reckless indifference (§ 190.2, subd. (a)(17)(B)). CALCRIM No. 731 gives the correct intent requirement for the former theory; CALCRIM No. 703 does the same for the latter. Giving both instructions is only correct if the prosecution pursues both theories of liability and the jury is expressly told that the instructions correspond to different special circumstance findings. (*People v. Odom* (2016) 244 Cal.App.4th 237, 256 (*Odom*).)

Here, the jury was instructed with both CALCRIM Nos. 703 and 731, even though the information did not specify which theory the prosecution would pursue. And the instructions did not indicate that the jury would have to decide between two

17

separate kidnapping special circumstance findings with separate intent requirements. Under these circumstances, the trial court erred in giving both instructions. (*Odom*, *supra*, 244 Cal.App.4th at p. 256.)

However, the error was harmless. " '[I]nstructional error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence." [Citations.]' " (*Odom*, *supra*, 244 Cal.App.4th at p. 257.) When CALCRIM Nos. 703 and 731 are given simultaneously, we must determine whether the record shows that defendant intended to kill the victim. (*Id.* at p. 258.)

As discussed, the evidence is overwhelming on this point. Because the jury returned a true finding on the lying-in-wait special circumstance allegation, it necessarily found that defendant intended to kill Julian. (*Johnson*, *supra*, 62 Cal.4th at p. 629 ["the . . . lying-in-wait special circumstance requires ' " 'an intentional murder' " ' "].) Thus, the instructional error was harmless.[15] (*Odom*, *supra*, 244 Cal.App.4th at p. 258.)

Defendant argues that the prosecution's lying-in-wait theory of liability—and thus, his intent to kill—only covers the first beating in defendant's bedroom, not the kidnapping and eventual murder. In other words, just "[b]ecause the jury found [defendant] had the intent to kill earlier did not mean he had the intent to kill later in the canyon."

Defendant cites no legal authority for the novel proposition that a lying-in-wait theory imposes an expiration on defendant's intent. (See *People v. Sorden* (2021) 65 Cal.App.5th 582, 603

---

[15] For this reason, we also reject defense counsel's suggestion at oral argument that the jury may have convicted his client under a theory of felony murder, murder under the natural and probable consequences doctrine, or another theory under which malice is imputed to a person based solely on that person's participation in a crime.

18

["failure to present reasoned argument and legal authorities in support" of a claim of error forfeits issue on appeal].) In any event, that notion is particularly unpersuasive where, as here, the first beating, kidnapping, and murder were a continuous series of events taking place over only about one hour.[16]

## IV. No Error in Failing To Excuse or Investigate a Juror's Cell Phone Use

Defendant argues that the trial court erred by failing to investigate or dismiss a juror who used his cell phone twice during the eleven-day trial.

### A. *Additional Relevant Background*

On November 9, 2023, defense counsel told the trial court that an anonymous person had advised him that one of the alternate jurors (the juror) was using his phone during the presentation of evidence on the prior day. Neither defense counsel nor the prosecutors personally saw the phone use. Defense counsel nonetheless asked the trial court to advise the jury. The trial court said that it would "watch it and see if there's any issue."

Before the court adjourned for lunch, defense counsel advised the court that he had seen the juror using the phone during cross-examination of a witness. The bailiff told the juror to stop doing so.

Defense counsel asked for the juror to be excused, arguing that his capacity for fair deliberation had been fatally compromised by his phone use. The prosecution requested that the trial court retain and admonish the jury.

When the jury reconvened, the trial court instructed the jury "to have . . . cell phones off when . . . in the courtroom [so they are] not . . . a distraction to you. Implicit in having it off means that you're not supposed to be looking at it . . . . [Y]ou're

---

[16] We are equally unconvinced by the speculative assertion that defendant could have believed Julian was dead by the time the kidnapping began.

supposed to be paying attention to what's going on in the courtroom when you are in the courtroom and not anything else . . . So please make sure that you do not use any electronic devices during the time that you are in the courtroom."

**B.** *General Law and Standard of Review*

Section 1089 permits a trial court to discharge a sitting juror " 'if, upon good cause, the juror is "found to be unable to perform his or her duty." ' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 262.) Our Supreme Court has held that " ' " '[o]nce [the] trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " ' " (*Cowan*, *supra*, 50 Cal.4th at pp. 505–506.)

Good cause to remove a juror may exist when the juror is sleeping during trial (*People v. Thompson* (2010) 49 Cal.4th 79, 137; *People v. Bonilla* (2007) 41 Cal.4th 313, 350), but not when there is a "mere suggestion of juror 'inattention' " ((*People v. Espinoza* (1992) 3 Cal.4th 806, 821 (*Espinoza*); *People v. Williams* (2013) 58 Cal.4th 197, 289 (*Williams*)).

" 'The decision whether to investigate the possibility of juror . . . incompetence[] or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*).)

**C.** *Analysis*

The trial court was twice put on notice of a potential issue with the juror and twice declined to investigate or discharge the juror. We find no abuse of discretion.

First, on the morning of November 9, 2023, defense counsel reported hearing from an anonymous source that the juror had used his phone inappropriately on the prior day. That speculation, without more, "was insufficient to apprise the trial court that good cause to discharge might exist, [and] did not obligate the court to conduct any further inquiry." (*Espinoza*, *supra*, 3 Cal.4th at p. 821; see also *Bradford*, *supra*, 15 Cal.4th at

p. 1348 ["The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial"].)

Second, later that afternoon, defense counsel observed the juror using his phone for an unspecified length of time. The bailiff saw the same incident and immediately told the juror to stop. Again, this incident did not trigger the trial court's duty to inquire. Defendant cites—and we have found—no case in which a juror being distracted twice during trial requires a formal inquiry into the juror's capacity. Indeed, even when a juror is observed committing the more egregious offense of "nodding off" during trial, "the absence of any reference in the record to the juror's inattentiveness over a . . . substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry." (*Williams*, *supra*, 58 Cal.4th at p. 290.)

Lastly, reviewing courts have found no abuse of discretion in declining to investigate where, as here, "no further incidents [are] reported" "after [the trial court] admonish[es] the jury to remain attentive[.]" (*Ibid*.)

Under these circumstances, we readily conclude that the trial court did not abuse its discretion in declining to investigate, let alone discharge, the juror. The cases defendant cites to the contrary are inapposite.[17] Because the trial court did not err, we need not address defendant's arguments that the alleged error was prejudicial.

---

[17] See, e.g., *People v. Burgener* (1986) 41 Cal.3d 505, 519–520, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 752-754 [trial court abused its discretion by failing to investigate foreperson's report that a juror was intoxicated during deliberations]; *People v. Trevino* (Colo. App. 1991) 826 P.2d 399, 401 [a juror's physical inability to hear testimony compromised defendant's constitutional right to a fair trial]; *State v. Speer* (Ohio 2010) 925 N.E.2d 584 [same]; *Com. v. Brown* (Pa. Super. 1974) 332 A.2d 828 [same].

## V. There Was no Cumulative Error

Defendant asserts that the cumulative impact of the alleged errors violated his constitutional right to due process. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.]" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)

We have found that the jury erred in returning a true finding on the robbery-murder special circumstance, and that the trial court erred in admitting the *Perkins* statements and giving two incompatible jury instructions. However, defendant is ultimately not prejudiced by any error. On appeal, we vacate the robbery-murder special circumstance finding. And we conclude that the remaining two errors were harmless under the applicable legal standards.

Aggregating these errors, we find no cumulative prejudice. " 'Defendant was entitled to a fair trial but not a perfect one.' [Citation.] Because we either correct or find harmless (individually and collectively) " '[t]he few errors that occurred during defendant's trial' . . . we reject defendant's contention that his constitutional right to a fair trial was violated." (*People v. Camacho* (2022) 14 Cal.5th 77, 132.)

22

## DISPOSITION

The robbery-murder special circumstance finding under section 190.2, subdivision (a)(17), is vacated.  In all other respects, the judgment is affirmed.  Because the lying-in-wait and kidnapping-murder special circumstance findings remain intact, our conclusion has no effect on defendant's sentence.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
GOORVITCH[*]

We concur:


_____, P. J.
LUI


_____, J.
RICHARDSON

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.