# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>　　v.<br><br>JULIE ANN IANNICIELLO,<br><br>　　　　　　　Appellant. | No. 86711-3-I<br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |

The respondent, State of Washington, has filed a motion for reconsideration of the opinion filed on December 15, 2025. The court has determined that the motion should be denied, but the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on December 15, 2025 is withdrawn; and it is further

ORDERED that a substitute published opinion shall be filed.

_____ Feldman, J.

_____ Chung, J.　　　　　_____ Mann, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86711-3-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| JULIE ANN IANNICIELLO, | |
| Appellant. | |

FELDMAN, J. — Julie Ann Ianniciello appeals her conviction for first degree murder after a jury found she shot and killed her husband following marital conflict and infidelity. She argues she did not receive a fair trial because (a) the State violated her Fifth Amendment right to silence by eliciting testimony regarding her pretrial silence, (b) her due process rights were violated when the trial court admitted approximately 800 pages of e-mails detailing her extramarital sexual conduct, (c) the conviction is not supported by sufficient evidence, and (d) the State invoked gender-based stereotypes at trial. Because the State violated Ianniciello's right to silence and has not proved beyond a reasonable doubt that the constitutional violation was harmless, we reverse and remand for a new trial.

I

On April 2, 2016, Ianniciello's husband, Tom,[1] was killed by a single gunshot to his head as he slept in his bed. At the time of the murder, Tom and Ianniciello had been married for over 16 years and lived together with their two daughters, Felicia and Tabitha, and Tom's biological daughter and Ianniciello's stepdaughter, Amber. The marriage was turbulent, as Tom had an issue with alcohol abuse and would become abusive to Ianniciello. Though later in their marriage Tom stopped drinking, the marriage improved only slightly.

Ianniciello began an affair with a coworker, Bradley Robinson, who was also married. In March 2016, Robinson's spouse suddenly passed away of pneumonia. Thereafter, Robinson expressed that he did not know when Ianniciello would be able to be together with him. Also around this time, Tom discovered Ianniciello and Robinson together in the back seat of her car during their lunchtime and became angry, hitting Ianniciello and calling her a whore. On March 29, a few days before the murder, Ianniciello e-mailed Robinson and said, "I have people packing my stuff for me, then I'm out. I don't know if it [is] a safe plan or not but it's my plan." Ianniciello's daughters were unaware of any plan of hers to leave.

On the evening of April 2, Tom went to bed after taking some Benadryl. Ianniciello, Felicia, and Tabitha decided to drive to pick up Amber from work. Felicia and Tabitha got in the car and waited around 10 minutes for Ianniciello, who was searching for Amber's cat, to join them. When Ianniciello got to the car, Felicia noticed that one of the doors to the house was open; Ianniciello went back

---

[1] For clarity, we refer to Julie Ann Ianniciello as Ianniciello and refer to every other member of the Ianniciello family by their first names.

into the house to close that door. The group then stopped by Ianniciello's parents' house before picking up Amber from work and returning home.

Once back in the house, Ianniciello and Amber noticed several things were out of order: Amber's cat was outside the house, the kitchen drawer where Tom kept his belongings was open and his belongings were on the countertop, and the sliding door to the backyard was open. Then, when Ianniciello opened the bedroom door, both she and Amber saw Tom on the bed, covered with blood. Ianniciello immediately told Felicia, Tabitha, and Amber to leave the house. They all went to the neighbor's house where Ianniciello called 911.

Police arrived minutes later but did not establish a perimeter because they did not think they "had somebody immediately fleeing the scene." When the officers began investigating in the bedroom, they observed that a 9 mm bullet had been fired into the right side of Tom's head, likely from 6 to 12 inches away, and had become lodged in the wall. They did not render medical aid to Tom because "it was fairly obvious that he was deceased." Officers found one fired 9 mm shell casing on the bed, and while Amber remembered that Tom previously owned a 9 mm gun, they did not find such a gun nor was one registered to Tom.

The officers found two other guns with holsters that were registered to Tom in a drawer and one unfired 9 mm cartridge fell from one of the holsters. Neither of the other guns that were found registered to Tom could have fired a 9 mm cartridge. Weeks later, officers found a black trash bag in the bedroom with 9 mm cartridges. All the 9 mm cartridges found in the bedroom and the 9 mm bullet recovered from the wall were from the same manufacturer and each cartridge had

loading marks indicating they all had been cycled at some point through the same firearm.

In the weeks following Tom's murder, law enforcement spoke with Ianniciello several times and searched her car but did not find any incriminating evidence. Officers also questioned Robinson several times, obtained his e-mail communications with Ianniciello, and accused him of playing a role in the murder. After nearly three years, the State charged Ianniciello with first degree murder. Ianniciello's first trial, in 2022, ended in a mistrial after the jury was unable to render a unanimous verdict. In 2024, the case proceeded to a second trial after which the jury rendered a guilty verdict. This timely appeal followed.

II

Ianniciello argues the State violated her right to silence under the Fifth Amendment of the United States Constitution and article I, section 9 of the Washington Constitution by eliciting testimony from multiple witnesses that she did not "reach out," "call," "check in," or "provide information" to law enforcement. We agree and remand for a new trial.

Although Ianniciello did not raise this constitutional challenge in the trial court, we may review an assignment of error that is raised for the first time on appeal when the claimed error concerns a "'manifest error affecting a constitutional right.'" *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting RAP 2.5(a)(3)). To satisfy these requirements, the appellant must both identify a constitutional error and demonstrate the error is manifest. *Id.* The manifest prong requires a plausible showing of (1) actual prejudice, meaning "the asserted error

had practical and identifiable consequences in the trial," and (2) "error . . . so obvious on the record that the error warrants appellate review." *Id.* at 99-100.[2]

Ianniciello's asserted error satisfies these requirements. First, the asserted error implicates her constitutional right to silence. *See, e.g.*, *State v. Easter*, 130 Wn.2d 228, 243, 922 P.2d 1285 (1996) ("The Fifth Amendment right to silence extends to situations prior to the arrest of the accused."). Second, the asserted error is manifest as Ianniciello has made a plausible showing that (1) the error had practical and identifiable consequences at trial in that the jury was permitted to consider her prearrest silence as evidence of guilt and (2) as the discussion below shows, the error "should have been reasonably obvious to the trial court." *O'Hara*, 167 Wn.2d at 108. Under RAP 2.5(a)(3), such an error "warrants appellate review." *Id.* at 100.

Turning to the merits of Ianniciello's argument, the Fifth Amendment to the United States Constitution provides that no person "shall be . . . compelled in any criminal case to be a witness against himself." Washington Constitution article I, section 9 likewise states "No person shall be compelled in any criminal case to give evidence against himself." The Washington Supreme Court has long held these constitutional provisions, which have been interpreted by Washington courts equivalently, implicate a prearrest, as well as a postarrest, privilege against self-

---

[2] While our courts' many interpretations of RAP 2.5(a)(3) have been described as "confusing," "cumbersome," and in "conflict with the plain language of the rule," *State v. J.W.M.*, 1 Wn.3d 58, 97, 524 P.3d 596 (2023) (Gordon McCloud, J., concurring), the discussion here strives to harmonize those decisions by stating a simple test that includes each of the required elements of "manifest error affecting a constitutional right."

incrimination. *Easter*, 130 Wn.2d at 235, 238, 243 ("The Fifth Amendment applies before the defendant is in custody or is the subject of suspicion or investigation.").

Thus, it is a violation of a defendant's Fifth Amendment right to remain silent for "the State in its case in chief to call to the attention of the trier of fact the accused's pre-arrest silence to imply guilt." *Id.* at 243. But because the Fifth Amendment privilege "'generally is not self-executing,'" the United States Supreme Court has held that a witness who desires its protections "'must claim it.'" *Salinas v. Texas*, 570 U.S. 178, 181, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (plurality opinion) (2013) (internal quotation marks omitted) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984)). The Court has also held, "'[N]o ritualistic formula is necessary in order to invoke the privilege.'" *Id.* (quoting *Quinn v. United States*, 349 U.S. 155, 164, 75 S. Ct. 668, 99 L. Ed. 964 (1955)). "A witness does not expressly invoke the privilege by standing mute." *Id.* at 187. Rather, one must "'make a timely assertion of the privilege'" to preclude the State from introducing prearrest silence as evidence of guilt. *Id.* at 189 (quoting *Garner v. United States*, 424 U.S. 648, 655, 96 S. Ct. 1178, 47 L. Ed. 2d 370 (1976)).

Here, the record establishes that Ianniciello invoked her Fifth Amendment right to silence. In the hours after Tom's death on April 2, 2016, Eleanor Broggi, the lead detective, asked Ianniciello, "Did you shoot your husband?" Detective Broggi expressed concern with Ianniciello's demeanor, saying, "I want you to look at our side kind of, of this" because "you don't seem overly concerned, or, you know, just upset about it." Detective Broggi asked Ianniciello if she would be willing to take a polygraph examination, and Ianniciello agreed to do so. A few weeks

later, on April 18, Ianniciello's attorney contacted Detective Broggi, notified her that Ianniciello would not be taking a polygraph examination, and asked her to have no further contact with Ianniciello. This clear statement that Ianniciello would not provide additional information to the police and should not be contacted by them is sufficient to invoke her Fifth Amendment privilege.

Notwithstanding this invocation, the State elicited at trial direct testimony from two detectives about Ianniciello's failure to contact them. During its examination of Detective Broggi, the State elicited testimony that Ianniciello did not "reach out," did not "check in on the status of the investigation," and did not "ever provide any information regarding items that were missing." Then, during Detective Michael Glasgow's testimony, the State again elicited testimony that Ianniciello never "reached out" and did not "call to check in about where things were at" after Detective Glasgow became the new lead detective. Later, the State again asked Detective Glasgow, "[Y]ou previously testified that Ms. Ianniciello never reached out to you as the lead investigator; is that correct?" Detective Glasgow responded, "That's correct." The State also continued this theme of drawing the jury's attention to Ianniciello's prearrest silence by eliciting testimony that Tom's other family members would "reach out" and "check in" on the investigation, "[b]ut not Ms. Ianniciello."

The State's conduct was an attempt to convince the jury that Ianniciello's silence, by not communicating with law enforcement, demonstrated her guilt. This is precisely what the Fifth Amendment prohibits. As our Supreme Court noted in *Easter*, "An accused's right to remain silent and to decline to assist the State in the

preparation of its criminal case may not be eroded by permitting the State in its case in chief to call to the attention of the trier of fact the accused's pre-arrest silence to imply guilt." 130 Wn.2d at 243. Despite this clear holding, the jury was permitted to consider Ianniciello's failure to reach out, call, check in, or provide information as evidence of guilt even though she had previously invoked her right to silence. On this record, Ianniciello has established the State violated her Fifth Amendment right to remain silent.

Having found the State violated Ianniciello's constitutional right to silence, we next examine whether the error was harmless. *See State v. Chuprinov*, 32 Wn. App. 2d 508, 520, 556 P.3d 1127 (2024). We presume that an error of constitutional magnitude is prejudicial, and the State bears the burden of proving harmlessness beyond a reasonable doubt. *Id.* at 520-21; *State v. Irby*, 170 Wn.2d 874, 886, 246 P.3d 796 (2011). "We place such a heavy burden on the State to 'deter . . . conduct' that 'undermines the principle of equal justice and is so repugnant to the concept of an impartial trial that its very existence demands that appellate courts set appropriate standards to deter such conduct.'" *State v. Heng*, 2 Wn.3d 384, 395, 539 P.3d 13 (2023) (quoting *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011)). "If the State cannot prove harmlessness, the remedy is a new trial." *Chuprinov*, 32 Wn. App. 2d at 521.

The State has not proved its repeated Fifth Amendment violations were harmless beyond a reasonable doubt. At trial, the State's case depended largely on circumstantial evidence. The State's theory heavily relied on Ianniciello's alleged desire to kill Tom to be with Robinson, her brief window of opportunity

when her daughters were waiting for her in the parked car, and her "odd" demeanor. The State questioned eight witnesses about Ianniciello's demeanor and reactions in the weeks after Tom's murder and elicited testimony that Ianniciello's demeanor was "calm," "[e]xtremely calm with no emotion," "weird," and "very cold." Detective Broggi, the lead detective on the case, testified that she found Ianniciello's demeanor and reaction to her husband's death "odd" and that this was evidence that "consistently point[ed] to Ms. Ianniciello as being responsible."

The State also relied at trial on toolmark and ballistics evidence that, it claims, conclusively established that Tom was murdered with his own gun and therefore could not have been killed by a burglar as Ianniciello posited. But the expert who provided this testimony did not testify unequivocally:

> Q. So -- so I understand, was your conclusion that at some point, all four of those unfired 9-millimeter cartridge casings were inside these same guns that fired that casing?
>
> A. Okay. Not quite that far. So all I can say, based on those cycling marks, is that all the four unfired cartridges and the one fired cartridge case were at one time cycled through the same firearm. Now, at some point in time, they could get cycled through another firearm. I don't know that. And the one that's fired, because I don't have firing pin impressions and other types of things, I can't say for certain that that fired cartridge case was fired in the same firearm that cycled all of them. That's an explanation. It's one of the possibilities. But the other possibility is all of those were cycled in one firearm, and that one fired cartridge case was additionally fired in a second firearm. Those are -- those are the two possibilities.

Additionally, Ianniciello's DNA and fingerprints were not detected on the fired cartridge or the unfired bullets.

Thus, contrary to the State's argument, it did not overwhelmingly establish Ianniciello's guilt at trial. Indeed, the first trial ended in a hung jury, and we may properly consider that result in deciding whether the State has proved its repeated Fifth Amendment violations were harmless beyond a reasonable doubt. *See State v. Carlson*, 80 Wn. App. 116, 129, 906 P.2d 999 (1995) (concluding, "the error was not harmless," and noting, "[t]he first trial ended in a hung jury"). The testimony about Ianniciello's prearrest silence and failure to communicate with the detectives worked to support the State's argument about Ianniciello's "incriminatory" demeanor, indicating Ianniciello was guilty because she was silent after Tom's murder and did not continue to talk with detectives. This testimony about Ianniciello's prearrest silence may have swayed the jury, and the State has not proved beyond a reasonable doubt this constitutional error had no impact on the jury's verdict.

Despite this, the State argues the testimony it elicited from the two detectives about Ianniciello's failure to "check in," "call," "reach out," and "provide any information" "involved nontestimonial conduct and did not implicate the Fifth Amendment." The State's argument is unpersuasive. The fact that Ianniciello did not contact the detectives clearly meant she was not speaking with them and was instead remaining silent. Ianniciello had asserted her Fifth Amendment right to silence after having agreed to later speak with Detective Broggi again and take a polygraph examination. Testimony of Ianniciello's failure to "reach out," "call," "check in," or "provide any information" was a clear proxy for her prearrest silence and thus implicates the Fifth Amendment.

The State also argues that the United States Supreme Court's opinion in *Salinas* "fatally undermines" our Supreme Court's holding in *Easter*. The State misreads *Salinas*. There, the prosecution introduced evidence of the defendant's noncustodial, prearrest silence. 570 U.S. at 182. The three-justice plurality chose not to address "a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview." *Id.* at 183. Instead, the Court concluded that the prosecution did not violate the Fifth Amendment by using the defendant's prearrest silence as evidence of guilt because the defendant did not invoke his Fifth Amendment privilege. *Id.* at 186. Because the *Salinas* plurality declined to address the division of authority on the issue of whether the Fifth Amendment applies to prearrest silence, the Washington Supreme Court's interpretation of the Fifth Amendment as applying "before the defendant is in custody," *Easter*, 130 Wn.2d at 238, 243, has not been overruled.

Lastly, the State argues Ianniciello cannot satisfy *Salinas*'s requirement that she invoke her right to remain silent "because Ianniciello was never subject to custodial interrogation" and thus "could not anticipatorily invoke her *Miranda*[3] rights." But Ianniciello did not invoke her *Miranda* rights; she invoked her Fifth Amendment right to silence. The right to silence originates from the Fifth Amendment, not *Miranda*. *See Roberts v. United States*, 445 U.S. 552, 560, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980) ("the right to silence described in [*Miranda*] warnings derives from the Fifth Amendment and adds nothing to it"); *Easter*, 130

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Wn.2d at 238 ("An accused's right to silence derives, not from *Miranda*, but from the Fifth Amendment itself."). And as discussed above, one need not be in custody to invoke their Fifth Amendment right to silence, as Ianniciello did here.

Despite Ianniciello's invocation of her right to silence, the State elicited testimony regarding her failure to "check in," "call," "reach out," or "provide any information" to law enforcement. This was constitutional error. Where, as here, there was constitutional error and the State does not prove harmlessness, "the remedy is a new trial." *Chuprinov*, 32 Wn. App. 2d at 521.

III

Having granted a new trial based on the State's repeated violation of Ianniciello's right to silence, we briefly acknowledge her remaining arguments.

Ianniciello argues her due process rights were violated and her trial was rendered "fundamentally unfair" when the trial court admitted sexually explicit e-mails chronicling Ianniciello and Robinson's extramarital affair. The State again argues we should not reach this issue because it was not preserved below and the asserted error is evidentiary in nature and thus not of constitutional magnitude as required to raise an issue for the first time on appeal. *See O'Hara*, 167 Wn.2d at 98-100 (quoted and discussed above). In so arguing, the State overlooks Ianniciello's reliance on *Andrew v. White*, 604 U.S. 86, 145 S. Ct. 75, 220 L. Ed. 2d 340 (2025). In *Andrew*, the State elicited evidence about Andrew's sexual partners, the outfits she wore to dinner or during grocery runs, the underwear she packed for vacation, and how often she had sex in her car. *Id*. at 88-90. The United States Supreme Court vacated Andrew's murder conviction and remanded

- 12 -

the case for further proceedings, noting that "the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." *Id.* at 96.

This case tests the limits of the Court's holding in *Andrew.* Similar to *Andrew*, the e-mails at issue here detailed Ianniciello's extramarital sexual conduct, including how often she and Robinson had sex, how often that occurred in their cars, the specific acts they performed during their sexual encounters, the anatomical areas involved, and the corresponding sexual fetishes. While the State argues that e-mails regarding the sexual nature of Ianniciello's relationship with Robinson were relevant to show her motive to kill Tom, the trial court admitted *several hundred* e-mails detailing her extramarital sexual conduct—many describing these activities in graphic detail—and the State in its closing argument *encouraged* the jury "to please look at those e-mails . . . ."

As the Court recognized in *Andrew*, the introduction of unduly prejudicial evidence regarding conduct similar to that at issue here can render a trial fundamentally unfair. If that occurs and the error is manifest, it can be raised for the first time on appeal under RAP 2.5(a)(3). *See supra* Part II. But we need not (and do not) decide this issue, having reversed for the reasons set forth in Part II above. For this same reason, we do not reach Ianniciello's remaining arguments that the evidence is constitutionally insufficient to support her conviction and the State violated her right to a fair trial by employing gender-based stereotypes at trial. We also leave for another day Ianniciello's argument that gender-based

misconduct should be analyzed under the heightened standard for prosecutorial misconduct used in cases of racial bias.

Reversed and remanded.

_____
Feldman, J.

WE CONCUR:

_____
Chung, J.

_____
Mann, J.